EAG:AL
F.#2010R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M 1 1 -850

- - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

UNITED STATES OF AMERICA

    -against-

JOSEPH MARRA,
    also known as "Joe Fish,"

        Defendant.

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT
(T. 18, U.S.C., § 894(a)(1))

- - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        SCOTT CURTIS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

        Upon information and belief, in or about and between June 2009 and November 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH MARRA, also known as "Joe Fish," together with others, did knowingly and intentionally conspire to participate in the use of extortionate means to collect and attempt to collect an extension of credit from John Doe, an individual whose identity is known to your deponent.

        (Title 18, United States Code, Sections 894(a)(1) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.    I have been a Special Agent with the Federal Bureau of Investigation since 1996.  During my tenure with FBI, I have been involved in various criminal investigations of organized crime.  These investigations have utilized, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants, consensual recordings and debriefing of confidential sources.  Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling, loansharking and extortion, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.    I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from cooperating witnesses, (c) information obtained from other law enforcement agents, (d) recordings made by cooperating witnesses, and (e) telephone records.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.  Because this affidavit is being submitted for the limited purpose of establishing probable cause

2

to arrest the defendant, I have not set forth each and every fact learned during the course of this investigation.  Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

<u>THE COLOMBO ORGANIZED CRIME FAMILY</u>

3.   At all times pertinent to this complaint, the members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter, the "Colombo crime family" and the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce.  The Colombo crime family was an organized criminal group that operated in the Eastern District of New York and elsewhere.

4.   La Cosa Nostra operated through organized crime families.  Five of these crime families - the Bonanno, Colombo, Gambino, Genovese and Luchese crime families - were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries.  Another crime family, the Decavalcante crime family,

3

operated principally in New Jersey, but from time to time also in New York City.

5.    The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families.  The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

6.    The Colombo crime family had a hierarchy and structure.  The head of the Colombo crime family was known as the "boss."  The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere."  Together, the boss, underboss and consigliere were the crime family's "administration."  With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups.  The administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family.  Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another

4

administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

7. Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

8. Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been "straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

9. Many requirements existed before an associate could become a member of the Colombo crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An

5

associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the administration then circulated the proposed associate's name on a list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

<u>Methods and Means of the Enterprise</u>

10. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by

6

threatening economic injury and using and threatening to use physical violence, including murder.

11.    Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family.  For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

12.    The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities.  That conduct included a commitment to murdering persons, particularly members or associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

13.    Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

<u>MARRA</u>

14.    MARRA is a long-time associate of the Colombo crime family.  Court records indicate that MARRA was arrested and detained in or around April 1995 in <u>United States v. Marra, et</u>

7

al., 94 CR 1119 (RR).  On or about July 12, 1996, in connection
with his association with the Colombo crime family, MARRA pled
guilty in that case to racketeering conspiracy, including murder
conspiracy as a racketeering act, in violation of 18 U.S.C. §
1962(d).  On the same date, he pled guilty in United States v.
Marra, et al., 95 CR 1155 (RR) to conspiring to defraud the
United States by evading income taxes, in violation of 18 U.S.C.
§ 371.  On November 8, 1996, Judge Raggi sentenced MARRA to
concurrent terms of imprisonment of 228 months in 94 CR 1119 and
60 months in 95 CR 1155.

## EXTORTION CONSPIRACY

15.   As described herein, there is probable cause to
believe that the defendant JOSEPH MARRA, together with others,
including Colombo crime family members Dennis Delucia and Joseph
Savarese, conspired to participate in the use of extortionate
means to collect and attempt to collect an extension of credit
from John Doe.[1]

---

[1]   On January 20, 2011, Delucia and Savarese were charged
with, inter alia, their participation in the use of extortionate
means to collect and attempt to collect an extension of credit
from John Doe (identified in that indictment as John Doe #20).
See United States v. Andrew Russo, et al., 11 CR 30 (KAM).

16.    An individual ("CW-1") who was a member of the Colombo crime family and who is cooperating with the government has advised as follows, in sum and substance and in part:[2]

a.    In or around 2006, when CW-1 was incarcerated with MARRA, MARRA told CW-1 that, after MARRA was incarcerated in 1995, John Doe collected a loansharking debt that was owed to MARRA by one of MARRA's loansharking customers.  MARRA further told CW-1 that John Doe gave a portion of the money collected to MARRA's wife, but kept the remainder for himself.  MARRA asked CW-1 if he would help MARRA collect the remainder when CW-1 was released from prison.  CW-1 agreed to look into the situation. CW-1 was released from prison in 2007.

---

[2]    CW-1 has pled guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including murder as a predicate racketeering act.  In exchange for his cooperation, CW-1 is hoping to receive leniency at sentencing and admission into the Witness Security program.  The information provided by CW-1 regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

b.   After CW-1's release from prison, Colombo
crime family member Joseph Savarese told CW-1 that he had
recently received a letter from MARRA asking for Savarese's
assistance in collecting money that John Doe owed to MARRA.[2]

c.   CW-1 and Savarese met with John Doe and
another person who was an associate of organized crime.  CW-1 and
Savarese confronted John Doe about the debt he owed MARRA, and
CW-1 threatened John Doe.

d.   CW-1 later met with Savarese.  Savarese told
CW-1 that he and then-Colombo family associate Iliaro "Fat Larry"
Sessa had assaulted John Doe because he had still not repaid the
debt owed to MARRA.

e.   After CW-1 was arrested on January 20, 2011,
CW-1 was incarcerated with Colombo crime family member Dennis
DeLucia, who prior to his arrest held the position of captain in
the Colombo crime family.  Delucia told CW-1 that he got involved
in the debt that John Doe owed to MARRA because John Doe's son

---

[2]      Prison records indicate that Savarese was also
incarcerated with Marra.  Prison records further indicate that
Savarese was transferred to a halfway house on or about August
19, 2008, was transferred to home confinement on or about January
5, 2009, and was released from home confinement on or around
February 13, 2009.  CW-1 has advised that he and Savarese were
inducted into the Colombo crime family together on or around
February 1, 2009.

had discussed it with a member of the Genovese crime family who knew Delucia.[3]

17.   Another individual ("CW-2") who was associated with La Cosa Nostra and who is cooperating with the government[4] has advised that on November 24, 2010, he met with Savarese ("JS") and had the following conversation, which was consensually recorded:[5]

| | |
|---|---|
| JS: | I'm fucked. |
| CW-2: | So what do you think about [John Doe]? |
| JS: | The only money with them is.  A couple of times I gave them gifts.  I give them birthday gifts every fuckin' birthday. |
| CW-2: | That can't be it. |
| JS: | Not that.  I gave them, when she had the first baby, I gave them little collection.  A couple of us sent him 600.  But in the summertime, we came an agreement with this cocksucker, [John Doe].  I beat him up over here, like, last year.  I was pounding him for the money, talking to him a |

---

[3]   This conversation between CW-1 and Delucia occurred before CW-1 began cooperating with the government.

[4]   CW-2, who was an associate of the Colombo family, has pled guilty pursuant to a cooperation agreement to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), with, inter alia, attempted murder and loansharking as predicate racketeering acts.  Among other things, CW-2, at the direction of the FBI, consensually recorded meetings with members and associates of La Cosa Nostra.  The information provided by CW-2 regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

[5]   The quotations provided herein are based on draft transcriptions and are subject to revision.

couple times.  I sent for him a couple of times.
He came over here to meet me.  Larry was
just pulling up and got out of the car.  We gave
him a beating right there.  Larry jumped out of
the car, we both beat him up.  Then he left.  Then
the son got in touch.  The son told me that I
don't want my father to get hurt again, I wanna
pay.  I said, alright.  I told him to pay, that's
the only way he's not going to get hurt again.
The figure was 13,000.  They had a guy from the
Westside, a goodfellow from the Westside.[6]
Reached out to Dennis.  Told Dennis that
he wanted to straighten it out.  Told the kid
Dennis, will you take 8,000.  Dennis said yeah.
He says, alright; he gave the money to Dennis.
Dennis gave the money to me.  And I gave the money
to [one of MARRA's daughters].  That's the only
money that.  I never sent money to the account.

\*      \*      \*

CW-2:      Have you seen [John Doe] after that?  Or the son?

JS:        I haven't seen him in ages.  And I didn't take no
           money from him.  I beat him up for the money.  The
           money went from one goodfellow to Dennis, from
           Dennis to me, from me to [one of MARRA's
           daughters].

Based on my investigation into this matter and the Colombo crime

family, I understand "Larry" to refer to Ilario "Fat Larry" Sessa

and "Dennis" to refer to Dennis Delucia.

    18.  On June 4, 2010, MARRA, who was incarcerated,

spoke with one of his daughters ("D") by telephone.  The Bureau

of Prisons ("BOP") records all telephone calls placed by

---

[6]    Based on my training and experience, I know that
members and associates of organized crime often refer to the
Genovese crime family as the "Westside."

inmates.[7]  The conversation, which was recorded, included the following:

|         |                                                              |
|---------|--------------------------------------------------------------|
| MARRA:  | We get from Uncle Joey?                                       |
| D:      | Yeah, I got it.                                              |
| MARRA:  | Oh, okay.  What did he give you?                            |
| D:      | Eight.                                                        |
| MARRA:  | Beautiful.  When did you see him?                           |
| D:      | I actually saw him that night that I spoke to you.          |

                    *        *        *

|         |                                                              |
|---------|--------------------------------------------------------------|
| D:      | He told me to tell you to write - I forgot, let me think for a second. |
| MARRA:  | "He told me to tell you to write"?                          |
| D:      | Yeah, write Dennis.                                          |
| MARRA:  | Oh, to write him?                                            |
| D:      | Yeah.                                                        |
| MARRA:  | Okay.                                                        |
| D:      | And to say thank you for him.                               |
| MARRA:  | Okay.                                                        |
| D:      | For helping or something.                                   |

---

[7]     A sign with the following language is posted above the telephones used by the inmates:

> Pursuant to the Bureau of Prisons inmate telephone regulations: All conversations on this phone are subject to monitoring, your use of this phone constitutes consent to this monitoring, you must contact your unit team to request an unmonitored attorney call.

MARRA:      Okay.

D:          Yeah.

MARRA:      Alright.  I'll do that right away.

D:          Yeah, that was it.

MARRA:      Okay.  Beautiful.  I'm glad he mentioned it.
            Yes.

D:          Yeah.

MARRA:      Alright, listen to me.

D:          What?

MARRA:      5 goes in the bank in the box.  The other 3
            is yours.  Congratulations on your
            graduation.

D:          Dad.

MARRA:      The other 3 is yours.  Shut up.

D:          That's a lot of money.

MARRA:      I said the other 3 is yours.

D:          Dad, that's a lot of money.

MARRA:      I said the other 3 is yours.  You hear me?

D:          I'm not gonna argue with you.

MARRA:      Good.

D:          Thanks, dad.

MARRA:      You're welcome.  You don't have to tell
            anybody.  You understand?  That's your
            business.

Based on my investigation into this matter and the Colombo crime

family, I understand "Uncle Joey" to refer to Savarese and

"Dennis" to refer to Dennis Delucia.

14

19.    On July 27, 2010, MARRA, who was incarcerated, spoke with his son ("S") by telephone.  The conversation, which was recorded, included the following conversation about CW-1's role in another dispute:

S:        This guy's like no joke?

MARRA:    No, he's not a joke.  None of -- neither is Uncle Joey.

S:        Alright.

MARRA:    Nobody's a joke.  You know what I mean, [son]?  You're in a different bracket now.

                    *        *        *

MARRA:    Well listen, [son], let me explain something to you.

S:        Go ahead.

MARRA:    I'm gonna make this -- when you're on the street?

S:        Uh huh.

MARRA:    These are the guys that run it.

S:        Okay.

MARRA:    You understand me?

S:        Mmmhm

MARRA:    If you don't wanna play by their rules, get off the street.

S:        Yeah.

MARRA:    Or deal with the consequences.

S:        Yeah.

MARRA:      You follow me?  And usually the consequences
            ain't good.  It's either embarrassing or, you
            know, one or the other.  You follow me?

S:          Yeah.

MARRA:      So that's all I'm gonna say to you.

S:          Alright.

MARRA:      Alright?  The street, believe it or not, has
            rules too.  That's why I want you to stay
            extremely low.

S:          Yeah.

MARRA:      And don't let anybody know -- that isn't
            supposed to know your business -- your
            business.  But you have your uncle over
            there, so you should never have a problem.
            And I'll be there before you know it.

Based on my investigation into this matter and the Colombo crime
family, I understand "Uncle Joey" to refer to Savarese.

20.    On or about November 23, 2010, agents of the FBI
served subpoenas on MARRA's two daughters.  During the
encounters, each of the daughters was separately shown a
photograph of Savarese and identified him as a family friend.

21.    On or about July 13, 2011, I spoke by telephone
with MARRA.  MARRA, who was in a halfway house, asked what legal
problem he could be facing given that he was about to complete a
sixteen-year term of imprisonment.  I told MARRA he may have a
problem related to the collection of money from John Doe.  MARRA
responded, in substance, "You mean the money that he collected
from me fifteen years ago that I just got back from him?"

16

22.   On or about July 14, 2011, I spoke with MARRA in person.   MARRA admitted that John Doe had collected a debt for him in or about 1995, when MARRA was incarcerated, and kept the money for himself.   MARRA also admitted that he asked Savarese to collect this money.

23.   In light of the information provided by CW-1 and CW-2, the recordings of MARRA and his daughter and son, the recording of Savarese, and the statements made by MARRA and his daughters to FBI agents, there is probable cause to believe that MARRA knowingly and intentionally conspired to participate in the use of extortionate means to collect and attempt to collect an extension of credit from John Doe.

24.   Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent

17

respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant JOSEPH MARRA, also known as "Joe Fish," so that he may be dealt with according to law.

Dated:     Brooklyn, New York
           August 18, 2011



_____
SCOTT CURTIS
Special Agent
Federal Bureau of Investigation


Sworn to before me this
18th day of August, 2011



_____
R, JR.
-------------- JUDGE
EASTERN DISTRICT OF NEW YORK



18